BOOZ v. PHILADELPHIA & L. TRANSP. CO. et al.

(Circuit Court, D. Delaware. June 11, 1903.)

No. 234.

1. SHIPPING—CHARTER—CONSTRUCTION—VALIDITY.

The complainant and the Philadelphia and Lewes Transportation Company entered into a charter party under seal by which the complainant hired a steam boat to that company for the term of six months for the hire and other considerations and on the conditions therein specified; the company covenanting, among other things, that the complainant

should "have a lien upon all of the property of said charterers, including the wharf at Lewes, Delaware," owned by the company. *Held*, on demurrer to a bill seeking to enforce a lien on the wharf, that the above quoted provision was not void for uncertainty, but, taken in connection with other provisions of the charter party, gave to the complainant an equitable lien on the wharf to secure or indemnify him against any and all defaults by the company in the performance of its duty to him under the terms thereof.

(Syllabus by the Court.)

In Equity.

Horace L. Cheyney, for complainant.
Herbert Ward, for defendant.

BRADFORD, District Judge. The bill in this case is brought by Edward D. Booz, a citizen of Maryland, to enforce an alleged lien against certain wharf property at Lewes, Delaware. The defendants have filed a general demurrer, and through their counsel at the hearing only one ground of demurrer was assigned, which was oral and as follows:

"The only ground for demurrer to be urged in this argument is that the supposed agreement for said lien is so ambiguous and uncertain as to be void and incapable of enforcement by this court."

It appears from the bill that the complainant and the Philadelphia and Lewes Transportation Company, hereinafter called the transportation company, a corporation of Delaware, and one of the defendants, entered April 23, 1901, into a certain charter party or agreement, "Exhibit A", under hand and seal, as follows:

"Charter party made this 23rd day of April, A. D. 1901, between Edward D. Booz of Baltimore City, State of Maryland, owner of the steamboat 'General J. A. Dumont' of 309 tons gross register and 195 tons net register, or thereabouts, now at the port of Baltimore, of the first part, and the Philadelphia and Lewes Transportation Company, a corporation established under the laws of the State of Delaware, charterers, of the second part;

Witnesseth, that the said owner, for the consideration hereinafter mentioned, agrees to let and the said charterers agree to hire said steamboat, together with such tackle, apparel, furniture and appurtenances belonging to the said steamboat, as per inventory attached hereto, for the term of six calendar months from the fifteenth day of May, 1901; the said steamboat to be delivered to the charterers at the port of Baltimore, fully sponsoned forward of wheels, and being otherwise tight, staunch, strong and in every way fitted for service; to be employed in lawful trade as the charterers or their agents shall direct, on the following conditions:

1. That the charterers shall pay for the use and hire of the said vessel, at the rate of fifteen hundred dollars ($1,500) per calendar month, payable monthly from the fifteenth day of May, 1901, hire to continue from the time specified for terminating the charter until her delivery with clear decks to owner (unless lost) at the port of Baltimore, Maryland, and upon the further consideration that three thousand dollars ($3,000) in non-assessable stock, at par value, of the said Philadelphia and Lewes Transportation Company be delivered to the said owner, at or before the delivery of the said boat; payment for the use and hire of the said vessel to be made in cash monthly in advance, in par funds. And in default of such payment or payments, as herein specified, or any other breach of this Charter Party, the owner shall have the faculty of withdrawing the said steamboat from the service of the charterers, without prejudice to any claim he (the owner) might otherwise have on the charterers, in pursuance of this charter.

2. And the said charterers hereby agree to assume all risk of damage or

loss from any cause whatsoever, including breakdowns, and to make all repairs necessary to keep the said steamboat in good running order during the term of this charter, and to deliver the said steamboat and the articles named in the inventory hereto attached, at the port of Baltimore, within five days after termination of this charter, free from all bills, liens or incumbrances of any nature whatsoever, except such bills, liens or incumbrances of any nature which may exist against said steamboat at the time of her delivery to the said charterers, the said vessel to be delivered in substantially the same condition as when delivered to the said charterers, reasonable wear and tear alone excepted.

3. The said charterers further agree to insure and to keep insured the said steamboat, her engines, boilers, tackle, apparel, furniture and appurtenances, as named in this Charter Party, and inventory attached, to the amount of thirty thousand dollars ($30,000) from the fifteenth day of May, 1901, wherever the said steamboat may be located, against damage or loss arising from fire, collision, foundering, stranding, breakage of machinery, etc., and separate insurance to be effected for an amount to be hereafter agreed upon, against the bursting of boilers; the intention being that the policy shall cover full marine insurance risk, except collision, which is to be the three fourths (¾) collision clause; said policies to be effected in the name of Edward D. Booz and to be delivered to the said Edward D. Booz at or before the delivery of the said steamboat to the said charterers, and the policies to extend from the fifteenth day of May, 1901, until the expiration thereof. It being the intention, however, that the said insurance of thirty thousand dollars ($30,000) is not understood to be the full valuation of the said steamboat in the event of loss, but that in the event of such loss, the valuation of the said steamboat is understood to be thirty five thousand dollars ($35,000) which risk of five thousand dollars ($5,000) over and above the insurance is assumed by the said charterers; the said thirty five thousand dollars ($35,000) being understood as an arbitrary valuation for the purposes of this Charter Party and is not to be understood as the actual valuation of the vessel by the owner in event of any negotiations for purchase by the said charterers.

4. And it is a further condition of this Charter Party that the first month's hire, which is payable on May 15th, 1901, shall be paid as follows: One thousand dollars ($1,000) at the signing of this Charter Party and five hundred dollars ($500) before the said steamboat leaves the port of Baltimore.

5. It is further agreed by the charterers that they will forward monthly to the said owner, a statement from all parties having had bills or other obligations against the said steamboat during the preceding month, stating over the signatures of the said parties, that said bills or other obligations have been paid.

6. And it is further agreed that no statement of the charter price of the vessel is to be made for any cause, unless the vessel be lost, in which event the said charterers shall be severally and jointly liable with the underwriters to pay to the said owner the sum or sums named in this Charter Party the charter price to cease at the time of the happening of the said loss and the insurance to then become immediately due and payable, and for any deferred payment of the said insurance, the owner is to be allowed six per centum interest.

7. That should dispute arise between the owner and the charterers, the matter in dispute shall be referred to three persons in Baltimore, one to be appointed by each of the parties hereto, and the third by the two so chosen, their decision or any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of court, said arbitration to be submitted in ten days after written notice of complaint.

8. That the said owner shall have a lien upon all of the property of the said charterers, including the wharf at Lewes, Delaware, and the said charterers hereby covenant that they hold an undisputed and clear legal title to the said wharf, without any incumbrance whatsoever, and that they will not dispose of or incumber the said wharf during the continuance of this charter, but this clause is not intended to prevent the said charterers from improving the said property because of such incidental obligations which may be thereby incurred.

In Witness Whereof the said Philadelphia and Lewes Transportation Company, charterers, by H. E. Vanden its General Manager for that purpose duly authorized, has hereunto set the name and seal of the said corporation, and the said Edward D. Booz, owner, has hereunto set his hand and seal on the day and year first above written.

The Philadelphia & Lewes Transportation Company.

Signed, sealed and delivered in        by
   presence of                     H. E. Vanden.
     A. Lee.      [Corporate Seal.]      Edwd. D. Booz.  [Seal.]
     Vespasian Ellis."

It further appears that Booz was the owner of the steamboat mentioned at the time of the execution of the above charter party or agreement; that the steamboat was duly delivered to the transportation company "in accordance with the terms of the said agreement and was retained by it thereunder" until November 15, 1901; that the said company "failed and neglected to pay all of the charter hire" to the complainant, "which became due to him under said agreement, and failed and neglected to deliver the said steamboat in substantially the same condition as when delivered to it, and at the time of the said redelivery the said steamboat was also subject to a lien for wages of crew amounting to $181.83", which the complainant has been compelled to pay; that at the time of the re-delivery of the steamboat to the complainant by the transportation company there was due from the latter to the complainant "under said agreement the following amounts:

| | |
|---|---:|
| 4 mos. hire from July 15, 1901, to Nov. 15, 1901, at the rate of $1,500 per month | $6,000 00 |
| Damage to said steamship in failing to return it in substantially the same condition as when delivered | 2,000 00 |
| Wages of crew | 181 83 |
| | $8,181 83" |

That the whole of said sum of $8,181.83 is still due and owing to the complainant by the transportation company "under said agreement, no part of the same having been paid"; that in accordance with the provisions of said agreement the complainant had a lien upon the wharf of the transportation company at Lewes, Delaware; that, on the day and at the time when said agreement was entered into, the defendant West was president of the transportation company and had "actual notice of said contract and of the provisions therein that the plaintiff should have a lien upon the wharf of the said Philadelphia and Lewes Transportation Company at Lewes, Delaware, for the amounts which might become due under said agreement to the plaintiff." That the following judgments were obtained against the transportation company, namely, judgment by confession in the Superior Court for Sussex County, Delaware, in favor of the defendant West, July 19, 1901, for $2,817.65; judgment by confession in the said court in favor of J. Howard Reber, trustee, October 14, 1901, for $2,750; judgment by confession in said court in favor of J. Howard Reber, trustee, October 10, 1901, for $2,750; and judgment recovered by John L. Conoway before a justice of the peace in Sussex County, Delaware, November 14, 1901, for $194.03 and $1.05 costs; that thereafter, by virtue of execution process on one or more of the above mentioned

judgments, said wharf was sold to the defendant Tunnell for $3,300, of which amount $205.17 was paid to Conoway on account of his judgment and costs, $2,987.66 was paid to George H. West, and $107.17 was paid to J. Howard Reber, trustee, these several sums aggregating the full amount of the purchase money; that the defendant Tunnell was "the purchaser of the said wharf at said sale for and on behalf of the said George H. West, who is, as plaintiff is advised, the owner of said wharf at the present time"; and that the sum of $8,181.83 due by the transportation company to the complainant under said agreement is a lien upon the said wharf.

The vital questions in the case are, first, whether the complainant has an equitable lien upon the wharf, and if so, for what. The counsel for the demurrants contend that no such lien exists for the reason, as alleged, that the charter party or agreement is fatally uncertain in omitting to specify the moneys or duties for the non-payment or non-performance of which the complainant should have a lien. They have cited a large number of cases, including Palmer v. Albee, 50 Iowa, 429; Atkins v. Van Buren School Township, 77 Ind. 447; Gelston & Meyenberg v. Sigmund, 27 Md. 334; Myers v. Forbes, 24 Md. 598; Church v. Noble, 24 Ill. 292; Gilpatrick v. Foster, 12 Ill. 355; Wainwright v. Straw, 15 Vt. 215, 40 Am. Dec. 675; Leonard v. Carter, 16 Wis. 607; Cummer v. Butts, 40 Mich. 322, 29 Am. Rep. 530; Delashmutt v. Thomas, 45 Md. 140; Figs v. Culer, 3 Starkie, 129; Clinan v. Cook, 1 Shoales & Lefroy, 22; Davies v. Davies, 36 Chan. Div. 559; Fairplay School Township v. O'Neal, 127 Ind. 95, 26 N. E. 686; Sherman v. Kitsmiller, 17 Serg. & R. 45; and Ballou v. March, 133 Pa. 64, 19 Atl. 304. Most, if not all, of these cases relate to patent ambiguities in contracts which it was sought specifically or otherwise to enforce; and a careful examination of them fails to disclose that they have any material bearing upon the case in hand. The propositions on which the complainant relies are that under the provisions of the charter or agreement he was given a lien upon the wharf, and other property of the transportation company unnecessary to be considered in this connection, to secure or indemnify him against any and all defaults by the transportation company in the performance of its duty to him thereunder, and that the kind and nature of such defaults are pointed out with sufficient certainty and particularity. In Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453, 457, 41 L. Ed. 865, some of the instances in which equitable liens arise are clearly pointed out by the court. Mr. Justice White in delivering the opinion of the court said:

"Before considering the contract itself, and the issue of fact which arises, it is necessary to fix the legal principles by which the question of equitable lien is to be determined. It is clear that if the express intention of the parties was to create an equitable lien upon the bonds or the value thereof, or if such intention arises by a necessary implication from the terms of the agreement construed with reference to the situation of the parties at the time of the contract, and by the attendant circumstances, such equitable lien will be enforced by a court of equity against the bonds in the hands of Brown or against third persons who are volunteers or have notice. It is well settled, said the court in Pinch v. Anthony, 8 Allen, 536, 'that a party may by express agreement create a charge or claim in the nature of a lien on real as well as on personal property of which he is the owner or in possession, and that

equity will establish and enforce such charge or claim, not only against the party who stipulated to give it, but also against third persons, who are either volunteers, or who take the estate on which the lien is agreed to be given with notice of the stipulation.' The subject was very fully reviewed with reference to the English and American authorities in Ketchum v. St. Louis, 101 U. S. 306 [25 L. Ed. 999], where the language just cited was approved, and that ruling was considered and reaffirmed, during this term, in Fourth Street Bank v. Yardley, 165 U. S. 634 [17 Sup. Ct. 439, 41 L. Ed. 855]. Pomeroy in his work on Equity Jurisprudence (vol. 3, par. 1235), condenses and states the general result of the authorities on the subject as follows: 'The doctrine may be stated in its most general form that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees and purchasers or incumbrancers with notice. * * * The ultimate grounds and motives of this doctrine are explained in the preceding section; but the doctrine itself is purely an application of the maxim, equity regards as done that which ought to be done.' ''

There can be no doubt that the parties to the charter party or agreement intended that the complainant should have a lien on the wharf at Lewes for some purpose; for paragraph 8 expressly provides that "the said owner shall have a lien upon   *   *   *   the wharf at Lewes, Delaware." Nor can there be any doubt that the subject of the lien, so far as sought to be enforced in this suit, was designated with all requisite certainty as the wharf of the transportation company at Lewes. Further, the prohibition against any disposition or incumbrance of the wharf "during the continuance of this charter" necessarily signifies, in the absence of any allegation to the contrary, that the lien to which the wharf was subject should not be disturbed or embarrassed by any disposition or incumbrance made by the charterers during the continuance of the agreement. And it is equally clear that the lien provided for had reference to the obligations and stipulations of the contract; for in the same paragraph it is provided that "the said charterers hereby covenant that they hold an undisputed and clear legal title to the said wharf, without any incumbrance whatsoever, and that they will not dispose of or incumber the said wharf during the continuance of this charter", &c. It is suggested by the counsel for the demurrants that the lien provided for might have reference to transactions other than those provided for by the agreement. But no reference to such other transactions, if any such were contemplated, is contained in the bill, nor is there any allegation by counsel of the existence of such. The charter or agreement, as a contract, is to be read as a whole in so far as it may be necessary to arrive at the true meaning of any particular clause. In the portion of the agreement preceding paragraph 8 provision is made for the payment of moneys and performance of certain duties by the transportation company with reference to which the lien in question can have proper application. The charter party, after setting forth the names of the parties, states that "the said owner, for the consideration hereinafter mentioned, agrees to let and the said charterers agree to hire the said steamboat   *   *   *   to be employed in lawful trade as the charterers

or their agents shall direct, on the following conditions." The con-sideration and conditions referred to are contained in eight para-graphs; and it is in the last of these paragraphs, immediately preced-ing the attestation clause, that the lien upon the wharf is provided for. Under these circumstances, and without referring more in detail to the contents of the agreement, it is wholly inadmissible to assume that the lien mentioned therein is either a nullity or has any other pur-pose than to secure the complainant against loss or damage by reason of the failure of the transportation company to comply with its duties and obligations therein fully and plainly set forth. The demurrer can-not be sustained on the ground of ambiguity or uncertainty in the statement of the lien or the purpose for which it was created.

Nor can the demurrer be sustained on the ground of non-joinder of proper parties. The bill does not pray for a personal decree against the defendants, or any of them. It seeks the enforcement of an al-leged equitable lien against the wharf, and sets forth that the defendant Tunnell was the purchaser of the wharf at execution sale for and on behalf of the defendant West, who is the owner of the wharf at the present time, and, further, that the defendant West was, at the time that the agreement was entered into, president of the transportation company, and had actual notice of the contract and of the provisions therein relating to a lien; and that the sum of $8,181.83, due by the transportation company, under the agreement, is a lien upon the wharf.

The demurrer must be overruled, with costs to the plaintiff in this cause hithereto accrued. And it is ordered that the defendants plead or answer on or before the sixth day of July, 1903.